UNITED STATES of America,

v.

Jack L. WILLIAMS, and Archibald R. Schaffer III, Defendants.

No. Crim.A. 96–0314 (JR).

United States District Court, District of Columbia.

May 29, 1998.

Donald C. Smaltz, Independent Counsel, Robert W. Ray, Chief Associate Independent Counsel, Will Frentzen, Associate Independent Counsel, Alexandria, VA, for United States.

John T. Kotelly, Barry W. Levine, Dickstein, Shapiro, Morin & Oschinsky, L.L.P., Washington, DC, for defendant Jack L. Williams.

William H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, for defendant Archibald R. Schaffer III.

### MEMORANDUM

ROBERTSON, District Judge.

Defendants are charged together as co-conspirators in an alleged scheme to buy favored treatment from the United States Department of Agriculture. Defendant Jack L. Williams was a principal lobbyist for Tyson Foods, Inc. Defendant Archibald R. Schaffer, III was Tyson Foods' vice-president in charge of media, public, and governmental affairs. Indictment ¶¶ 2(c) & (d). The charges are made in a second superseding indictment; the first two indictments charged Williams alone.

The indictment describes various interests of Tyson Foods that were pending before USDA while Secretary Alphonso Michael ("Mike") Espy was Secretary of Agriculture, ¶¶ 12–16, and charges that gifts and perquisites worth $12,218 were given to or for the benefit of the Secretary, his girlfriend, and the then-Acting Assistant Secretary of Agri-culture over a 13–month period from January 1993 to February 1994. The gifts and perquisites—seats to the 1993 Presidential inaugural gala, travel and lodging connected with a Tyson birthday party in Russellville, Arkansas, travel, lodging and tickets to a National Football Conference playoff game in Dallas, a Tyson foundation scholarship for the Secretary's girlfriend, and, for the Acting Assistant Secretary of Agriculture, a $13 basketball ticket and a first-class upgrade coupon for an airplane flight from Memphis to Washington National Airport—are the factual bases for one count of conspiracy, five counts of mail and wire fraud, three counts of Meat Inspection Act violations, and four counts of illegal gratuities. Defendant Williams is also accused of making false statements to investigators who were looking into these allegations in the spring of 1994. *Id.*, ¶¶ 34–42.

Defendants filed a number of motions to dismiss the indictment in various ways. Rulings on the motions were issued on May 22, 1998. The motion to dismiss Counts IX and XIII for improper venue was granted. The rest were denied. The reasons for those rulings are set forth below.

I. *Motions to dismiss Counts II – VI (mail and wire fraud) and Count I (conspiracy) for failure to state an offense*

■ The denial of defendant's motions attacking the mail and wire fraud and conspiracy counts was without prejudice to presentation of the supporting arguments at the close of the Independent Counsel's case-in-chief. Defendants are correct, of course, that it is not a crime to give money to a public official openly and with no intent to win anything more than good graces. Unless the IC adduces proof of the deceit necessary to sustain a conviction for the "honest services" variety of mail and wire fraud, or that the things of value given to Secretary Espy and others were given "for or because of" some action favorable to Tyson Foods' interests or to influence official action, these charges will be dismissed at that time. They will not, however, be dismissed for defects in the indictment.

*Motion to dismiss Counts II – VI*

■ The elements of mail and wire fraud are: (1) a scheme to defraud and (2) the use of interstate wires or mail to further that scheme. *See United States v. Lemire*, 720 F.2d 1327 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Counts II – VI of the indictment charge the defendants with devising or attempting to devise a scheme or artifice to defraud the United States of its right to the Secretary of Agriculture's honest services, *see* 18 U.S.C. §§ 1342, 1343 & 1346, and set forth the necessary elements in the language of the statutes, describing the five communications that allegedly constitute mail or wire fraud. In addition, Counts II – VI incorporate the first 17 paragraphs of the indictment, which outline defendants' alleged gift-giving, and paragraph 25, which lists 21 overt acts the defendants are alleged to have committed in furtherance of a conspiracy.

Defendants say that these counts should be dismissed because, although they recite the language of the statute, they do not specify the conduct in which defendants engaged that is supposed to have constituted bribery-like behavior. The IC responds that the necessary elements of mail and wire fraud are included in the indictment, and that defendants' demand for more specificity goes to the proof required at trial and not the sufficiency of the indictment.

■ Certainly, the mail and wire fraud charges would fail if they did not set forth what the "scheme or artifice to defraud" is alleged to be. *See United States v. Curtis*, 506 F.2d 985, 992 (10th Cir.1974), *quoted in United States v. Nance*, 533 F.2d 699, 702 (D.C.Cir.1976). It is not necessary, however, to charge that the defendants had in mind bribery or a specific *quid pro quo*.[1] It is sufficient to charge behavior with an element of deceit—behavior that would prove the defendants had the specific intent to defraud. *See United States v. DeFries*, 129 F.3d 1293,

1306 (D.C.Cir.1997). Thus, an attempt to induce undisclosed biased decisionmaking for personal gain could sustain a charge of intent to defraud, *see United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir.1996) (lobbyist convicted of giving gifts to state lawmaker with regulatory authority over lobbyist's client), but an allegation that the defendant violated an anti-gift-giving regulation or gratuity statute would not be enough without more, *see, e.g., id.; United States v. Czubinski*, 106 F.3d 1069 (1st Cir.1997); *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

■ Besides reciting the elements of the statutes, Counts II–VI incorporate two allegations of behavior that, if proven, would add the necessary element of deceit. In ¶ 25(b), the indictment alleges that the defendants engaged in subterfuge with respect to Secretary Espy's travel to Arkansas for what turned out to be a Tyson birthday party. And, in ¶ 25(f), it alleges that Williams and Schaffer made materially false statements to law enforcement officials about their gifts to Secretary Espy.

*Motion to dismiss Count I*

Count I charges defendants with conspiracy to violate the gratuities statute, 18 U.S.C. § 201(c)(1)(A), the mail and wire fraud statutes, 18 U.S.C. §§ 1342, 1343 & 1346, the Meat Inspection Act, 21 U.S.C. § 622, and the false statements statute, 18 U.S.C. § 1001. A charge of conspiracy under 18 U.S.C. § 371 must contain the following elements: that there was an agreement; that the purpose of the agreement was to break the law; that there was an overt act; that the purpose of the act was to further the conspiracy; and that the defendants entered the conspiracy willfully. *See, e.g.; United States v. Daily*, 921 F.2d 994 (10th Cir.), *cert. denied*, 502 U.S. 952, 112 S.Ct. 405, 116

---

1. The only case that would appear to hold otherwise, *United States v. Brumley*, 116 F.3d 728 (5th Cir.) *(en banc), cert. denied*, —— U.S. ——, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997), does not, in fact, go that far. The *Brumley* court held that at trial, the government must prove that a defendant acts or intends to act against the best interests of his employer to prove an intent to defraud the employer of honest services. The court specifically left open the question of whether this standard could be met by a violation of a civil statute, such as a gift reporting act; it did not *require* a showing of bribery-like behavior.

L.Ed.2d 354 (1991). Defendants argue that the indictment fails to charge the necessary agreement to break the law. Each basis for charging a conspiracy, except for violation of the Meat Inspection Act,[2] is addressed in turn.

■ *Gratuities offenses:* One of the purposes of the alleged conspiracy, according to the indictment, was to violate 18 U.S.C. § 201(c)(1)(A) (gratuities to public officials). ¶¶ 19 & 19(b). Count I does not recite the elements of a gratuities violation, nor· is it necessary that an indictment for conspiracy describe the underlying offense with the specificity that would be necessary to charge that offense: "In a charge of conspiracy, the conspiracy is the gist of the crime, and certainty, to a common intent, sufficient to identify the offense which defendants conspired to commit, is all that is requisite in stating the object of the conspiracy." *Williamson v. United States,* 207 U.S. 425, 447, 28 S.Ct. 163, 52 L.Ed. 278 (1908); *see also Wong Tai v. United States,* 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

■ It is well established, however, that each count in an indictment, unless it expressly incorporates other counts, must be sufficient to stand alone. *See United States v. Fulcher,* 626 F.2d 985 (D.C.Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980); *see also* Fed.R.Crim.P. 7(c)(1). Mere citation to the statute for the underlying offense is insufficient by itself to put the defendant on notice as to the nature of the crime he is charged with agreeing to accomplish. *See Williamson,* 207 U.S. at 449, 28 S.Ct. 163 (citation alone is not enough to "import, . . . susceptible of no other construction, [] that the unlawful agreement contemplated a future [crime]"); *see also United States v. Werme,* 939 F.2d 108, 112 & n. 1 (3rd Cir.1991), *cert. denied,* 502 U.S. 1092,

112 S.Ct. 1165, 117 L.Ed.2d 412 (1992); *but cf.* United States v. Offutt, 127 F.2d 336 (D.C.Cir.1942).

■ Count I goes beyond mere citation of the gratuities statute. It recites Tyson Foods' interests before the Department of Agriculture, and it provides detail about the things of value that defendants allegedly gave to Secretary Espy and others. But Count I survives defendants' challenge only if it also alleges that these things of value were given "for or because of" some ·action that was taken or was to be taken regarding Tysons' interests.

■ Paragraphs 10 and 19(b), read ·together, provide the necessary allegation of intent. Paragraph 10 states that the Meat Inspection Act prohibits giving things of value "with intent to influence [an] . . . officer or employee of the United States in the discharge of any duty." Paragraph 19(b) states that defendants violated the Meat Inspection Act. Charging defendants with the "intent to influence" USDA officials satisfies the intent element of the gratuities statute, and in fact, it is more than that statute requires. *See United States v. Sun–Diamond Growers,* 138 F.3d 961, 966 (D.C.Cir.1998) (intent to reward sufficient for proving gratuities violation). Count I thus sets forth the elements of illegal gratuities with sufficient specificity.

■ *Mail and wire fraud:* The IC's failure to cite to the mail and wire fraud statutes in Count I is not fatal to the charge. *See* Fed.R.Crim.P. 7(c). Defendants' alleged scheme to commit mail and wire fraud is described with enough specificity to state the object of the conspiracy. Paragraph 19 sets forth the necessary scheme to defraud,[3] and eleven of the overt acts described in ¶ 25 involve the use of mails· or wire to further the

2. None of the motions that address substantive issues involving the Meat Inspection Act will be dealt with in this opinion. The MIA issues are the subject of an appeal pending before the U.S. Court of Appeals for the District of Columbia Circuit in *United States v. Espy,* 145 F.3d 1369 (D.C.Cir.1998) (notice of appeal filed Jan. 5, 1998).

3. Paragraph 19 charges that defendants "knowingly combined, conspired, confederated and

agreed together and with each other to defraud the United States of America, by interfering with and obstructing the lawful governmental functions of the United States Department of Agriculture, a department and agency thereof, of and concerning its right and the right of the citizens of the United States to the honest services of Secretary Espy performed free from deceit, fraud, dishonesty, conflict of interest and unlawful compensation."

alleged conspiracy.[4] This suffices to show "certainty, to a common intent, sufficient to identify the [mail and wire fraud] offense which defendants conspired to commit." *Williamson*, 207 U.S. at 447, 28 S.Ct. 163.

■ *False statements:* Defendants argue that violation of 18 U.S.C. § 1001 cannot be charged as the object of the conspiracy here because the central purpose of the alleged conspiracy, to curry favor with Secretary Espy, was ended by newspaper exposure before the statements were allegedly made, and "acts committed after the central purpose of a conspiracy has been achieved or abandoned, and intended solely to cover up and conceal the completed ·conspiracy or escape detection ànd punishment, are not acts in furtherance of the conspiracy." Def. Mot. to Dismiss Count I at 9. That argument hyperextends the rule of *Grunewald v. United States*, 353· U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), which dealt with the question whether. attempts at concealment could be regarded as overt acts in furtherance of the conspiracy in. order to extend the statute of limitations.

■ So, too, does the IC's theory—that the objective to buy Secretary Espy's services continued as long as he was in office—overstate the rule of *United States v. Maloney*, 71 F.3d 645 (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996). The correct rule is the narrower· one, articulated in *United States v. Marcus· Schloss & Co., Inc.*, 710 F.Supp. 944 (S.D.N.Y.1989), and faithful to the core of *Grunewald*, that acts of concealment may indeed be in furtherance of a conspiracy, if concealment was an express purpose of the conspiracy in the first place. The false statements allegedly made by Williams and Schaffer are charged in Count I as an agreed-upon "Objective[ ] of the Conspiracy." *See* ¶¶ 21–22. That is the proper charging language. It remains to be seen whether the IC has evidence to support the charge. To sustain his case, the IC must show either that there was an express agreement between the defendants to conceal their gift giving or that the false statements occurred while the conspira-

cy was in full swing. *See Marcus Schloss*, 710 F.Supp. at 950. The latter .will be an uphill battle at trial, given that the alleged gifts and gratuities were exposed in the *Wall Street Journal* before either defendant was interviewed for the first time.

II. *Defendant Williams' motion to dismiss Count I (conspiracy), Counts V – VI (wire fraud), and Counts XII – XIII (gratuities) for prosecutorial vindictiveness*

■ .Defendant Williams was originally charged with two counts of false statements, stood trial on those charges, prevailed on his post-conviction motion for a new trial, and was then charged in two superseding indictments, not only with the false statements, but also with conspiracy, wire fraud, and violation of the Meat Inspection Act. Under controlling precedent, these facts give rise to a presumption of vindictiveness. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974).

Defendant argues further—and beyond the "heartland" presumption raised by the addition of charges after his successful post-trial motion—that the IC's conduct in this prosecution evidences an intentional plan to make him run the gauntlet of successive prosecutions and to wear him down financially and otherwise to force a plea of guilty and an agreement to cooperate. This argument, which relies primarily on *United States v. Meyer*, 810 F.2d 1242 (D.C.Cir.1987), *vacated*, 816 F.2d 695, *reinstated*, 824 F.2d 1240, *cert. denied*, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), is that the circumstances of the IC's charging decision demonstrate a "realistic likelihood of vindictiveness."

The defendants in *Meyer* had been cited for demonstrating in front of the White House without a permit. Approximately 50 of those cited chose to stand trial rather than pay the $50 fee in satisfaction of the citation. The government then proceeded against those defendants, charging, not only demonstrating without a permit, but also obstruction of sidewalks in front of the White House. The district court dismissed all the charges on the basis of prosecutorial vindictiveness,

---

4. ¶¶ 25(b)(ii), (iii) & (v); (c)(ii), (iii), (iv), (v), (vi) & (viii); (d)(iii) & (iv).

and the Court of Appeals affirmed. The court noted, *inter alia,* that:

1) the prosecutor increased the charges after defendants' pre-trial assertion of a constitutional right, 810 F.2d at 1246–47;

2) the additional charges were filed only against those defendants who chose to stand trial, *id.;*

3) the "simplicity and clarity" of the case indicated that the charges could all have been brought from the outset, *id.;*

4) the prosecutor's subsequent offer to drop the second charge indicated not a gesture of good faith (as the government argued), but an attempt to deprive defendants of their right to a jury trial,[5] *id.;* and

5) "the government's motivation to act vindictively" was heightened because the government was facing 36 protracted and potentially embarrassing trials over what it considered petty offenses, *id.*

The facts of the present case give rise to a greater likelihood of vindictiveness than in *Meyer.* The IC knew, and admits that it knew, every fact necessary to every charge that has been brought against defendant Williams before the original indictment was filed, and indeed, the IC formed the intent before proceeding to trial on the false statements charges alone that he would later charge Williams with all of the charges he now faces. *See Ray Affidavit,* ¶¶ 9, 11.[6]

 In his rebuttal submission, the IC shows that Williams had notice, well before the original indictment was filed, of the IC's plan to bring additional gratuities charges, and possibly a conspiracy charge. *See* Trans. of Mot. Hrg., Nov. 27, 1996, at 14–16. Pre-trial notice of the intent to bring additional charges is indeed sufficient to rebut the presumption of "heartland" vindictiveness if the alternatives are "openly presented" to the defendant prior to his refusal of a plea bargain. *Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *see also Meyer,* 810 F.2d at 1248 ("the government may be able to escape the presumption altogether by providing notice to the accused.") Moreover, although it is true that the transcript does not expressly recite discussion of additional charges under the Meat Inspection Act or mail and wire fraud statutes, those charges arise out of the same conduct. *See United States v. Goodwin,* 457 U.S. 368, 382, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), observing that prosecutors often make their initial charging decisions before researching all of the legal and factual issues of a case and add related charges as a matter of course.[7]

 The rebuttal of "heartland" vindictiveness as a matter of law under the *Bordenkircher* rule does not dispose of defendant's argument that the IC intentionally put him through successive trials in order to deplete his resources and force him into a guilty plea/cooperation agreement, however. It is necessary to give further consideration to the justifications offered by the IC for his actions.

The IC's first justification, that he could not bring the charges relating to "honest services" fraud at the outset because he was

5. The second charge increased the defendants' criminal exposure to one year, entitling them to jury trials.

6. The Chief Associate Independent Counsel stated that he had drafted an indictment in March, 1997 (prior to the first trial) that included conspiracy, false statements, mail and wire fraud, Meat Inspection Act, and gratuities counts against Williams. The one count that may have been delayed by the ongoing Tyson investigation appears to be Count X, relating to the Presidential Inaugural tickets, because the IC did not receive proof of Tyson's involvement in the purchase of those tickets until June, 1997.

7. Defendant adds a further twist in his latest submission on this topic: he focuses on the IC's statement in open court on October 3, 1997 that he intended to go to trial on the First Superseding Indictment. This statement was followed by a further round of failed plea negotiations and then by additional charges in the Second Superseding Indictment. That statement, Williams submits, negated any notice he had received regarding additional charges and shows that his choices had not been "openly presented" in the final round of plea negotiations, thus requiring a finding of vindictiveness relating to the newest charges filed in the Second Superseding Indictment. However, I have trouble holding the IC to his statement as a solemn promise. The transcript discloses, indeed, that defense counsel was skeptical of the statement when it was made.

still considering the impact of recent decisions, seems to be *post hoc* rationalization. Both of the decisions in question were from other circuits, and both were handed down (save for the *en banc* decision in *Brumley*) before the first indictment in this case. There was no unusual level of uncertainty about the law of honest services fraud in this circuit.

The IC's second justification, that the additional charges were delayed by the IC's ongoing investigation into Tyson Foods that was not completed until December, 1997, is not adequately explained and is ultimately unpersuasive. With perhaps one exception, *see* note 6 *supra*, the IC's submission does not demonstrate how that investigation affected this case (or *vice versa)* with regard to which charges could be brought against defendant Williams or when they could be brought.

The only sustainable justification for the IC's tactic of proceeding against Williams in two trials is suggested (but not stated) by the IC's admission that the original, two count indictment was brought against Williams to pressure him into cooperating with the Tyson investigation (and, presumably, the Espy investigation). To exert the pressure of an indictment is undoubtedly a legitimate prosecutorial tactic. Unfortunately, that tactic can lead to the ugly result presented in this case, since according to conventional wisdom, a threat, once made, must be carried out in order to preserve "credibility." In this case, however, pressing ahead to trial on the first indictment knowing there would be another one was an arrogant demonstration of the unlimited resources available to prosecutors appointed under the Ethics in Government Act and grossly inconsiderate of defendant's resources (and those of the court).

Nonetheless, "the fact of multiple prosecutions, standing alone, does not prove an abuse of prosecutorial discretion," *United States v. Pungitore*, 910 F.2d 1084, 1111–12 (3rd Cir.1990), *cert. denied,* 500 U.S. 915, 111 S.Ct. 2009–10, 114 L.Ed.2d 98 (1991). A prosecutor's attempt to bring about a guilty plea through otherwise legitimate means may be ham-handed without being vindictive. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 54 L.Ed.2d 604.[8]

III. *Motion to dismiss Count IX (Meat Inspection Act), Count XIII (gratuities), and part of Count I (conspiracy) as beyond the jurisdiction of the Independent Counsel; Motion to dismiss Counts VIII – IX (Meat Inspection Act), and XII – XIII (gratuities) for lack of venue*

The indictment charges, both as gratuities and Meat Inspection Act violations, that Williams gave or tried to give the Acting Assistant Secretary of Agriculture a $13 basketball ticket and an upgrade coupon for an airline flight from Memphis to Washington National Airport. The reason for the presence of these *de minimis* charges in the Second Superseding Indictment is suggested in IC Smaltz's affidavit, ¶ 20. He states that he was concerned that I had excluded relevant evidence at the first trial and that such evidence would "only be admitted in a gratuities prosecution." The apparent reference is to these small gifts, which were denied admission as Fed.Rule Evid. 404(b) "other acts" in the first trial. Defendants now move to dismiss these counts and two counts of illegal gifts to Secretary Espy's girlfriend on the ground that the District of Columbia is an improper venue. Williams also argues that the charges relating to the basketball ticket and the airline upgrade are beyond the jurisdiction of the IC. I will address the second argument first.

*Motion to dismiss Counts IX, XIII, and part of Count I*

Defendants' argument is that constitutional constraints placed on the Ethics in Government Act, as well as the Act itself, prohibit construing the IC's jurisdiction broadly enough to cover gifts to an Acting Assistant Secretary.

As the Independent Counsel is an inferior officer with narrowly defined duties, his of-

---

**8.** Defendant expresses doubt about *Bordenkircher's* continuing vitality given that prosecutors in post-Guidelines cases enjoy a greatly enhanced ability to determine a defendant's sentence through their charging decisions. I cannot decide that issue.

fice is, at least in theory, limited in tenure, and he is subject to removal by the Executive Branch. His powers are confined to investigating and prosecuting predetermined subject matter and do not involve policy formulation. He "can only act within the scope of the jurisdiction that has been granted by the Special Division pursuant to a request by the Attorney General." *Morrison v. Olson,* 487 U.S. 654, 672, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

 The powers of the Special Division are similarly circumscribed, and it is indeed the limitation on those powers that saves the Act's constitutionality under Article III. The Special Division is constrained to grant jurisdiction to an independent counsel only over matters that are "demonstrably related" to the factual circumstances that gave rise to the Attorney General's request for an independent counsel. *See id.* at 679–80, 108 S.Ct. 2597. Upon application by the Attorney General, the Special Division is to appoint an independent counsel and define his or her jurisdiction to "assure that the Independent Counsel has adequate authority to fully investigate and prosecute the subject matter with respect to which the Attorney General has requested the appointment of the Independent Counsel, and all matters related to that subject matter." 28 U.S.C. § 593(b)(3). *Morrison* teaches that this power is not a license to construe the IC's jurisdiction broadly: the Special Division's authority to define the IC's jurisdiction is drawn directly from the Attorney General's application and is merely ancillary to its appointment powers. Section 593(b)(3) tells the Special Division that the Independent Counsel's jurisdiction is to include all matters related to the subject matter of the Attorney General's request, as well as crimes "arising out of" the investigation, "including perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses." *Id.; see also United States v. Secord,* 725 F.Supp. 563 (D.D.C. 1989).

The Independent Counsel did not seek a referral from the Attorney General or the Special Division to pursue the basketball ticket and the upgrade coupon, as he might have done, and as he and other IC's did in such cases as *United States v. Tucker,* 78 F.3d 1313 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 76, 136 L.Ed.2d 35 (1996); *United States v. Blackley,* 986 F.Supp. 607 (D.D.C.1997); *United States v. Crop Growers Corp.,* 954 F.Supp. 335 (D.D.C.1997); and *United States v. Sun–Diamond Growers of California,* 941 F.Supp. 1262 (D.D.C.1996). The question is thus whether prosecution for gifts given to the Acting Assistant Secretary is within the terms of the IC's original grant of jurisdiction.

The language of the original grant is quite specific. The Independent Counsel has jurisdiction to investigate "whether [Secretary Espy] has committed a violation of any federal criminal law ... relating in any way to the acceptance of gifts by him from organizations or individuals with business pending before the Department of Agriculture." The Independent Counsel may also investigate "other allegations or evidence of violations of any federal criminal law ... by any organization or individual developed during the Independent Counsel's investigation referred to above and *connected with or arising out of that investigation*" (emphasis added).

In *In re Espy,* 80 F.3d 501 (D.C.Cir.1996), the Special Division, using its powers under § 594(e), determined that the IC has jurisdiction to prosecute matters related to gifts given to Secretary Espy's *chief of staff:*

IC Smaltz maintains that the referral matter directly overlaps his current jurisdiction in terms of persons involved, witnesses, patterns of conduct, and applicable law, and that the factual basis of the referral matter arose directly from his investigation of whether Secretary Espy violated any federal criminal law relating in any way to the acceptance of gifts by him from organizations or individuals with business pending before the Department of Agriculture. While he concedes that the original jurisdictional mandate makes no specific mention of the precise factual matters underlying his referral request, IC Smaltz explains that they share the common foundation of improper influence exerted in connection with items pending before the Department of Agriculture in return for favors or gifts to Secretary Espy or those

close to him, suggesting an ongoing pattern of such dealings, and that certain close associates of Secretary Espy are deeply involved in all of these matters. *Id.* at 508. That determination, if I am bound by it,[9] requires analysis at least of whether the Acting Assistant Secretary was someone "close to" Secretary Espy. Given *Morrison*'s teaching that the IC's jurisdiction must be interpreted narrowly, this would be a thorny task indeed. But, since Counts IX and XIII have been dismissed for improper venue, it is a task that need not be accomplished at this time.

*Motion to dismiss Counts VIII, IX, XII, and XIII*

Defendants argue that these four counts improperly seek to lay venue in the District of Columbia for offenses that did not occur here. The IC responded that this motion was "frivolous." At oral argument, I asked for a proffer supporting the venue claim as to Counts IX and XIII. Having reviewed this material *in camera* and *ex parte,* I conclude that the motion as to Counts IX and XIII is not frivolous but, indeed, well founded.

■■■ Venue to prosecute a criminal act lies in the district where the act was begun, continued or completed. 18 U.S.C. § 3237(a); *see also Goodloe v. United States,* 188 F.2d 621 (D.C.Cir.1950), *cert. denied,* 342 U.S. 819, 72 S.Ct. 35, 96 L.Ed. 619 (1951). For a Meat Inspection Act offense, venue lies where defendants "give, pay, or offer, directly or indirectly," a thing of value to a covered person under the Act. 21 U.S.C. § 622. For a gratuities offense, venue lies where defendants "give, offer, or promise" a thing of value to a public official. 18 U.S.C. § 201(c)(1)(A); *see also United States v. North,* 910 F.2d 843 (D.C.Cir.1990), *superseded in part,* 920 F.2d 940, *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). The district where the official act sought to be influenced by a gratuity or other thing of value was performed or was to be performed is not a proper venue unless

the offense was begun, continued, or completed there. *See United States v. White,* 887 F.2d 267 (D.C.Cir.1989). It is the government's burden to prove venue as to each count by a preponderance of the evidence, and, if the evidence is sufficient, venue is normally a question that is submitted to the jury. *See United States v. Lam Kwong-Wah,* 924 F.2d 298 (D.C.Cir.1991).

■■■ Count VIII alleges that the defendants violated the Meat Inspection Act by providing a "[w]eekend football trip to Dallas, Texas, including airfare, limousines, parking, pregame brunch, food and drink, and skybox tickets to the Dallas Cowboys—Green Bay Packers NFL playoff game," "to and for the benefit of" Secretary Espy. ¶ 31. Count XII alleges that the identical things of value were provided "to and for the benefit of" Secretary Espy in violation of the gratuities statute. *See* ¶ 33. Both counts also incorporate the allegations of ¶ 25, including that the tickets were delivered to the girlfriend at her home in Washington, D.C.

The question of whether the gifts to Secretary Espy's girlfriend provided things of value to Secretary Espy is dealt with in part V of this opinion, *infra.* The subsidiary question, of *where* the value was given when the Secretary met his girlfriend in Dallas, is not dispositive of the venue question, because the indictment charges that the tickets were physically given to the Secretary's girlfriend in Washington D.C. on January 13, 1994. *See* ¶ 25(d). If there were violations, they may have been completed in Dallas, but the indictment properly charges that they were begun, or perhaps continued, in the District of Columbia.

■■■ Counts IX and XIII are different. They charge defendants with providing the Acting Assistant Secretary with a "[s]kybox seat at [a] University of Arkansas–Vanderbilt University college basketball game and [a] first class upgrade of [her] airline ticket" in

---

**9.** It is not entirely clear that the Special Division's interpretation of the Independent Counsel's jurisdiction is binding on this court. The Court in *Morrison* labeled the Special Division's power to define the IC's jurisdiction under

§ 594(e) as "incidental" to its *appointment* power—which, presumably, means that the Special Division in *In re Espy* was not deciding an Article III case or controversy.

violation of the Meat Inspection Act and gratuities statute. ¶¶ 31 & 33.

It is beyond dispute—and indeed, the Independent Counsel barely tries to engage in one—that the first-class upgrade was given to the Acting Assistant Secretary in Nashville. Nothing in the indictment suggests that the upgrade was offered or promised in Washington, D.C. As to the basketball ticket, the only connection with the District of Columbia appears in the allegation that defendant Williams spoke with the Acting Assistant Secretary in D.C., "offered to obtain" a basketball ticket for her, and discussed the itinerary for her travel to Arkansas to meet with Tyson Foods officials. *See* ¶ 25(e)(i)(ii). Nothing in the government's proffer would enable a reasonable juror to infer that the offer was of a free ticket.[10]

IV. *Motion to dismiss Count X (gratuities) and part of Count I (conspiracy) for failure to state an offense*

■ The charge that four tickets to President Clinton's 1993 inaugural was an illegal gratuity to Secretary Espy will presumably be defended at trial on the ground that it was not given for or because of any official act performed or to be performed. The challenge raised by motion is that Secretary Espy was not a person covered by the gratuities statute.

The gratuities statute makes it a crime to give a thing of value to a "person selected to be a public official." 18 U.S.C. § 201(c)(1)(A). The statute defines a "person selected to be a public official" as "any person who has been nominated or appointed to be a public official, or has been officially informed that such person will be so nominated or appointed." 18 U.S.C. § 201(a)(2). Defendants argue that "officially informed" must mean, in the case of a Cabinet officer, informed by the President, acting as President, or the word "officially" will be rendered meaningless. *See Wilson v. Block*, 708 F.2d 735, 751 (D.C.Cir.), *cert. denied*, 464 U.S. 956,

104 S.Ct. 371, 78 L.Ed.2d 330 (1983). Since the tickets were allegedly given on January 18, 1993, and President Clinton could not have "officially" done anything as President until he was inaugurated on January 20, 1993, defendants say the inaugural gratuities counts must fail.

The IC's response that the Presidential Transition Act of 1963, 3 U.S.C. § 102, confers "official" status on a President-elect is unavailing. That Act provides money and office space to the President-elect's transition team, but does not—and cannot—deem any of the President-elect's actions "official" before he or she complies with the Oath and Affirmation Clause. The gratuities statute does not require, however, that it be the President who "officially" informs a Cabinet officer of his prospective nomination. Congress held hearings on the Espy nomination as early as January 14, 1993. *See* 139 Cong. Rec. D43–03. If someone acting in an official capacity informed Secretary Espy of his impending nomination before January 18, 1993, the statutory element of official notice is satisfied.

V. *Motion to dismiss Count V (wire fraud), Counts VII – VIII (Meat Inspection Act), Counts XI – XII (gratuities), and part of Count I (conspiracy), for failure to state an offense*

■ This motion asserts that defendants may not be criminally charged for providing things of value (travel expenses and educational assistance) to Secretary Espy's girlfriend; neither the gratuities statute nor the Meat Inspection Act prohibit gifts to third parties. While both statutes prohibit the "provision of any thing of value, directly or indirectly" to a covered official, neither includes the additional phrase "or to a third party" that is found in the bribery statute. *Compare* 18 U.S.C. § 201(c)(1)(A) *and* 21 U.S.C. § 622 *with* 18 U.S.C. § 201(b)(1). Thus, defendants argue, Congress knows

---

10. The IC also asserts that "[i]f necessary, [it] will prove at trial that flights taking off from and arriving at National Airport necessarily travel through the District of Columbia," Gov't Opp. at 17, and he cites *United States v. Ramirez–Amaya*, 812 F.2d 813 (2d Cir.1987). That case involved

drug trafficking. The express provision of 18 U.S.C. § 3237(a) that a trafficking or commerce-related offense may be prosecuted in any district "through or into which" such commerce moves does not apply here.

how to criminalize gifts to third parties, but has expressly declined to do so in the context of either the gratuities statute or the Meat Inspection Act. The IC responds that the things of value given to the Secretary's girlfriend were "indirect" gifts to him, and that it is for the jury to determine whether they were "things of value" to him.

The government's position is well supported: the term "thing of value" is to be broadly construed to encompass intangible benefits, so long as the jury is instructed that they must determine whether the donee placed any value on the intangible gifts. *See, e.g., United States v. Sun–Diamond Growers of California*, 941 F.Supp. at 1269–70; *see also, United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir.1986), *cert. denied*, 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987).

■ But, defendants argue, even intangible benefits must have been given *to* a covered official in order to be unlawful. A gift of intangible companionship might be a crime, the argument goes, but this indictment does not charge that defendants provided the Secretary with companionship. It charges that they provided his girlfriend with travel expenses and educational assistance. The IC does not respond to this nuance of defendants' argument, but the argument fails: in each of the four substantive counts at issue (VII, VIII, XI and XII) under the column labeled "thing of value," the word "Espy" appears in bold type preceding the description of the gift at issue. Although the indictment would read more clearly if it had a separate "recipient" column, it sufficiently charges that the gifts were given "to" the Secretary, at least as a matter of pleading. It is for the jury to determine whether Secretary Espy placed any value on the provision of gifts to his girlfriend.

### ORDER

After a pretrial conference held today, and upon further consideration of defendants' motion to dismiss the Meat Inspection Act counts (Counts VII and VIII) of the second superseding indictment for failure to state an offense, it is this 29th day of May, 1998,

**ORDERED** that the motion to dismiss the Meat Inspection Act counts [# 153] is **denied.** It is

**FURTHER ORDERED** that the oral motion of defendant Schaffer to sever the Meat Inspection Act counts is **denied.** It is

**FURTHER ORDERED** that the oral motion of defendant Williams for a continuance of the trial is **denied.** And it is

**FURTHER ORDERED** upon review of the materials submitted by counsel for defendant Williams and represented to be a complete printout of the contents of a website created and maintained by the Independent Counsel, and that the motion of defendant Williams for an order directing the Independent Counsel to take down the website is **denied,** although the Court does note with surprise that the section entitled "summary of prosecutions to date" contains a remarkably misleading statement of the reason why the verdict in the first Williams trial was set aside and further notes the absence, from the section entitled "selected briefs and court opinions," of this Court's memorandum of June 11, 1997, setting forth the real reason.