**UNITED STATES of America, Appellee,**

v.

**Nokuzola NTSHONA, Defendant–Appellant.**

**Docket No. 97–1473.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 14, 1998.

Decided Sept. 10, 1998.

Earle Giovanniello (Sorrel Danilowitz, of counsel), Gorman & Enright, New Haven, CT, for Defendant–Appellant.

Ilene Jaroslaw, Asst. U.S. Atty., Eastern District of New York (Zachery W. Carter, U.S. Atty., David C. James, Asst. U.S. Atty.), for Appellee.

Before: CALABRESI, CABRANES, and STRAUB, Circuit Judges.

PER CURIAM:

Appellant Nokuzola Ntshona appeals her conviction and sentence entered in the United States District Court for the Eastern District of New York (Charles P. Sifton, *Chief Judge*) on August 11, 1997. Appellant, a medical doctor, was convicted under 18 U.S.C. § 286 of defrauding Medicare by signing false medical equipment payment claims for the elderly residents of several Newark housing projects. We affirm.

## BACKGROUND

In 1992, Rodney Jackson, along with his brother Carey and mother Diane, began conducting self-styled "health fairs" for the elderly in Newark.[1] At these fairs, the Jacksons would demonstrate medical equipment and solicit the names and personal information of those who attended. With this information, the Jackson brothers would submit Medicare payment claims for medical equipment in the names of the attendees. Some of these payment claims were for actual equipment orders, but many were not. (Medicare pays 80% of the cost of valid medical equipment claims to the supplier, and the patient is liable for the remaining 20%.) To receive payment from Medicare, the Jacksons were required to submit Certificates of Medical Necessity ("certificates") signed by a doctor who had examined the patients for whom equipment was ordered.

Appellant was the doctor who signed many of the certificates for the Jackson brothers, in spite of the fact that she never examined any of the Jacksons' "patients." By submitting false reimbursement claims to Medicare with Appellant's help, the Jacksons were able

---

1. Diane Jackson was tried along with Appellant and was acquitted.

to profit not only at the expense of the government but also of the elderly patients who found themselves liable for 20 percent of the cost of medical equipment that many of them had never ordered. In exchange for Appellant's assistance, the Jackson brothers paid some of her personal bills and gave her several cash payments.

At trial, the government introduced the oral testimony of Rodney Jackson and of several of the elderly patients who had been involved. One patient, Bessie Strickland, was asked whether she still used the equipment that the Jacksons had convinced her to buy. She replied, "I don't use the leg machine because I found out that that could kill me and I just didn't like them for doing that to me when I found out." The district court denied Appellant's motion for a mistrial following Strickland's comment, but did caution the jury: "Obviously, the witness is not in a position to give her own medical view as to the effect of this machine, but I will permit it to remain as an explanation for why she doesn't use it." In addition to the oral testimony, more than 300 certificates, many of which were signed by Appellant, were introduced over Appellant's objection. These certificates all referred to the tenants of the few Newark housing projects near which the Jacksons had conducted their health fairs.

Following Appellant's conviction, she was sentenced at level 19 pursuant to the Sentencing Guidelines. This included a two level enhancement for Appellant's "abuse of a position of trust" under U.S.S.G § 3B1.3.

## DISCUSSION

■ Appellant challenges two of the evidentiary rulings at trial. First, Appellant argues that the admission of Strickland's statement was inflammatory and prejudicial. We find no error in the admission of this single comment by Strickland and believe that the district court handled the situation properly. Second, Appellant asserts that the introduction of 300 certificates without any oral testimony from the patients listed in them was erroneous because the jury could not properly infer that the claims submitted through these 300 certificates were false. This contention lacks merit. The certificates

diagnosed a large number of tenants from a small group of Newark housing projects as all having similar medical conditions and, therefore, needing similar equipment. Under the circumstances, the jury could plausibly have inferred that these documents were fraudulent.

Third, Appellant argues that her conviction should be reversed because the government violated 18 U.S.C. § 3500 (the "Jencks Act") by failing to disclose Jencks Act material after the direct examination of the relevant witness. The government contends that it discovered the material after trial, and that it disclosed the material the day after it was discovered. A status conference was held shortly thereafter. We find no error because Appellant waived her right to move to vacate the conviction.

As to the sentence, Appellant argues that she should not have received an enhancement under § 3B1.3 of the Sentencing Guidelines for abuse of trust. This section provides that:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

U.S.S.G. § 3B1.3.

Appellant contends that for her offense, Medicare fraud, an abuse of trust is the essence of the crime and therefore is already accounted for in the base level offense. She relies on our decision in *United States v. Broderson,* 67 F.3d 452, 456 (2d Cir.1995), in which we held that "[t]he conduct that is the basis of the conviction must be independently criminal ... and not itself the abuse of trust." *See Broderson,* 67 F.3d at 456.

■ Appellant reads *Broderson* too broadly. As we have explained subsequently, an abuse of trust enhancement must involve a fiduciary-like relationship that goes beyond "simply the reliance of the victim on the misleading statements or conduct of the defendant." *United States v. Jolly,* 102 F.3d 46, 49 (2d Cir.1996). However, the abuse of

trust need not be entirely unrelated to the commission of the base offense. *See United States v. Carrozzella*, 105 F.3d 796, 800–01 (2d Cir.1997) (Although a lawyer's filing of false accounts was included in the base level offense, the court identified it as grounds for an abuse of trust enhancement. The lawyers's conduct "fits quite comfortably within Guidelines § 3B1.3.... His position as a trustee in the probate court was characterized by precisely the type of discretion and consequent lack of supervision that the commentary to the guideline sets out as the key feature of a position of trust. ... The accounts he filed were a standard part of a fiduciary's responsibility.").

■ We adopt the view of the other circuits presented with this issue and hold that a *doctor* convicted of using her position to commit Medicare fraud is involved in a fiduciary relationship with her patients and the government and hence is subject to an enhancement under § 3B1.3. *See United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997) (upholding enhancement under § 3B1.3. for ophthalmologist in Medicare fraud case); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir.1995) (upholding enhancement for internist who took illegal kickbacks from welfare funds).

The judgment of the district court is affirmed.